**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 3:03-cr-8** |
| | ) | |
| **TADASHI DEMETRIUS KEYES,** | ) | |
| *Defendant.* | ) | |

**EMERGENCY MOTION TO REDUCE SENTENCE
PURSUANT TO THE FIRST STEP ACT OF 2018**

In 2004, this Court sentenced Mr. Keyes to life imprisonment for a crime that he committed when he was just 18 years old—a sentence that was required because the sentencing guidelines were mandatory at the time.  Mr. Keyes was convicted of two counts after trial by a jury.  The first was conspiracy to possess with the intent to distribute 50 grams or more of cocaine base, for which he received a sentence of life.  The second was possession of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), for which he received a sentence of 120 months, to run consecutively with his life sentence.

Under the First Step Act of 2018, Mr. Keyes is eligible for a reduction of his drug offense sentence, and this Court should reduce his sentence from **life** to an aggregate sentence of 255 months – 135 months for his drug offense, plus 120 consecutive months for his firearm charge.  Mr. Keyes has been in custody since September 17, 2002—nearly 17 years.  Because such a sentence could result in his immediate placement in a halfway house, Mr. Keyes respectfully asks for this motion to be considered on an expedited basis.

## LEGISLATIVE BACKGROUND

On December 21, 2018, the First Step Act of 2018 was enacted into law. Section 404 of that law made the Fair Sentencing Act of 2010 ("2010 FSA") retroactive to defendants who were sentenced pursuant to mandatory minimum penalties that were subsequently altered by the 2010 FSA.  That law altered the mandatory minimums applicable to crack cocaine offenses, such that the quantity sufficient to trigger the five-year mandatory minimum was increased from 5 grams of cocaine base to 28 grams of cocaine base, and the quantity sufficient to trigger the ten-year mandatory minimum was increased from 50 grams of cocaine base to 280 grams.  Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010).

Section 404(b) of the First Step Act of 2018 provides that defendants who were subjected to mandatory minimum penalties that were subsequently modified by the 2010 FSA may file a motion for a reduced sentence.  First Step Act of 2018, § 404(b) (Dec. 21, 2018) (available at: https://www.congress.gov/bill/115th-congress/senate-bill/756/text?r=115&s=3).

## PROCEDURAL BACKGROUND

1.  On April 8, 2004, a jury convicted Mr. Keyes of one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, as well as one count of possessing a firearm in connection with a drug trafficking crime under 18 U.S.C. § 924(c).

2.  The presentence report calculated that the applicable drug weight for the conspiracy that Mr. Keyes was a part of was 1.5 kilograms of crack cocaine.

3.      However, the presentence report applied a cross reference to U.S.S.G. § 2A1.1 which called for a base offense level of 43 because, as part of the conspiracy, one of Mr. Keyes' co-defendants murdered someone.   The presentence report also applied an obstruction of justice enhancement of 2 levels because Mr. Keyes denied that he had participated in the conspiracy or possessed a firearm in his presentence report interview.

4.      Counsel for Mr. Keyes objected to the drug weight, the murder cross-reference, and the obstruction enhancement at sentencing and the district court overruled the objections.

5.      On appeal, the Fourth Circuit affirmed his convictions but vacated his sentence for resentencing consistent with *United States v. Booker*, 543 U.S. 220 (2005).

6.      At resentencing, the district court imposed the same sentence and the Fourth Circuit upheld the sentence.  With respect to the murder cross-reference, the Fourth Circuit explained that it was not required that Keyes agree to kill anyone because the "murder was reasonably foreseeable to Keyes."  Because the life sentence was within the guideline range, it was presumed reasonable and it was affirmed.

7.      Mr. Keyes, who was 19 years old at sentencing, has been incarcerated for this offense since September 17, 2002.

## ARGUMENT

The First Step Act of 2018 made the changes from the Fair Sentencing Act of 2010 retroactive.  Under the Fair Sentencing Act of 2010, Mr. Keyes' statutory maximum for his drug offense (50 grams or more of crack cocaine) would have been 40 years, and not life imprisonment.  As this Court has already decided, it is the drug weight of conviction (50 grams or more of crack cocaine) and not the drug weight determined to be relevant conduct that determines eligibility for relief under the First Step Act.  *See United States v. Herbert*, No. 5:97-cr-30024, 2019 WL 2718498, at *2 (W.D. Va. June 28, 2019) ("Accordingly, the Court will consider the crime of conviction not the conduct reported in the PSR").  This holding accords with those made by every other Judge in this district, as well as the vast majority of courts across the country.  *See, e.g., United States v. Ancrum*, No. 2-30020, 2019 WL 2110589, at *3 (W.D. Va. May 14, 2019) (J. Urbanski) (reducing life sentence to time served and noting that "although *Apprendi* and *Alleyne* are not retroactively applicable on collateral review, this court joins other courts in finding that their holdings are applicable in the context of the First Step Act") (collecting cases).  Therefore, Mr. Keyes **is eligible for relief**.

After determining that Mr. Keyes is eligible for relief, this Court is permitted to modify a previously imposed term of imprisonment.  18 U.S.C. § 3582(c) provides that a court "may not modify a term of imprisonment once it has been imposed" except under narrow circumstances.  One of which is where modification is

"expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B).  The only limits on this Court's discretion are those within the First Step Act of 2018.

If the Government takes the same position in this case that it has taken in other cases, the Government will argue that the Court should find persuasive the constraints that apply to sentence reductions under 18 U.S.C. § 3582(c)(2).  That section states:

> in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o)…the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2).

The Government will have no citation or authority for why § 3582(c)(2) is persuasive or relevant to the district court's authority under a wholly separate statute. In this case, the Sentencing Commission has not lowered a sentencing range, and there are no applicable policy statements issued by the Sentencing Commission.  Instead, it is the Government's opinion that the § 3582(c)(2) analysis should be employed for First Step Act motions as well.

However, this analogy fails.  Unlike both §§ 3582(c)(1)(A) and (c)(2), section 404 of the First Step Act and § 3582(c)(1)(B) contain no reference to policy statements issued by the Sentencing Commission.  In fact, Congress gave the Commission no power or authority to issue policy statements regarding the circumstances or by what amount a sentence may be reduced through 28 U.S.C. §

994(t) or (u).  This is a critical difference between the First Step Act and prior retroactive drug amendments.  There is simply no law, or policy statement, that says that the district court shall simply substitute in the Fair Sentencing Act guideline amendments and must issue a sentence within that guideline range.

It is for this reason that the limitations the Government will point to from *Dillon v. United States*, 560 U.S. 817 (2010), also do not apply.  *Dillon* was fundamentally a statutory interpretation case.  The relevant statute, § 3582(c)(2), limited the district court's authority based on the Sentencing Commission's policy statements in U.S.S.G. §1B1.10.  *Dillon*, 560 U.S. at 828.  As a direct result, district courts are constrained by § 1B1.10's instructions in determining both eligibility and the extent of the reduction authorized.  *Dillon* cannot be extended to cover a different statute and subsection of § 3582(c).

This Court has already agreed that once someone is eligible for a reduction under the First Step Act, the Court must consider the § 3553 sentencing factors to determine whether to impose a reduced sentence.  The Judges in this district have repeatedly found that a sentence beneath the guideline range is appropriate based on consideration of these sentencing factors.  *See, e.g., United States v. Herbert*, No. 5:97-cr-30024, 2019 WL 2718498, at *2 ECF # 261 (W.D. Va. June 28, 2019) (reducing 324-month low-end of the guideline range sentence to 300 months); *United States v. Jeffers*, No. 5:04-cr-30042 (W.D. Va June 19, 2019) (reducing low-end guideline sentence to 181 months); *United States v. Grimmond*, No. 3:93-cr-70058 (W.D. Va. June 19, 2019) (reducing guideline sentence of life to below-guideline sentence of time

served); *United States v. Ancrum*, No. 2-30020, 2019 WL 2110589 (W.D. Va. May 14, 2019) (reducing life sentence to 240 months, beneath guideline range of 360 to life); *United States v. Lewis*, No. 3:08-cr-39 (W.D. Va. May 8, 2019) (reducing sentence below guideline range to time served); *United States v. Stanback*, No. 5:02-cr-30020, 2019 WL 1976445 (W.D. Va. May 2, 2019) (reducing sentence below low-end of guideline range); *United States v. Hairston*, No. 4:06-cr-00018, 2019 WL 1049387 (W.D. Va. Mar. 5, 2019) (reducing guideline sentence of life to below-guideline sentence of time served); *United States v. Monroe*, 3:94-cr-41 (W.D. Va. Feb. 19, 2019) (reducing sentence below guideline range to time served).

Therefore, there should be no question that Mr. Keyes is eligible to be considered for a sentence beneath his guideline range which remains life imprisonment based on the murder cross reference. The statutory maximum sentence this Court could impose for Mr. Keyes drug offense after the Fair Sentencing Act would have been 40 years. Therefore at a minimum, this Court should reduce Mr. Keyes sentence to 40 years for his drug offense, plus the 120 consecutive months for his gun offense. But such a sentence would be greater than necessary to meet the § 3553 sentencing factors in this case because of (1) his youth at the time of the offense, and (2) because he did not directly participate in the murder that led to his guideline range of life.

I.    *Mr. Keyes' Age of 18 During the Offense Supports a Significant Reduction in His Sentence*

Mr. Keyes was 19 when he first appeared before this Court for sentencing, but he was only 18 when he participated in the drug conspiracy. The Supreme

Court has made it clear that juveniles (understood as under the age of 18) are different. The Eighth Amendment limits the sentences that can be imposed on children.[1] This is because youth are understood to have **reduced culpability** but also **greater capacity for reform**. This understanding has derived from psychology and brain science showing "fundamental differences between juvenile and adult minds."[2] However, contemporary neuroscience and "evolving standards of decency" compel extending the same conclusion about individuals under age 18, as for someone who was 18 at the time of the offense like Mr. Keyes. Adolescence is a "transient" period of "immaturity, irresponsibility, impetuousness, and recklessness" that does not end on an 18th birthday. *Graham*, 560 U.S. at 72.

For this reason, the Court should consider that sentencing guideline § 5H1.1 specifically provides that youth "may be relevant in determining whether a departure is warranted, if considerations based on age, either individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." A significantly below-guideline sentence is warranted in this case because Mr. Keyes' age played a significant role in his offense.

---

[1] *Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting execution of children under 18 at time of offense); *Graham v. Florida*, 560 U.S. 48, 74-75 (2010) (children convicted of non-homicide offenses cannot be sentenced to life without parole and must have "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"); *Miller v. Alabama*, 567 U.S. 460, 473 (2012); *Montgomery v. Louisiana*, 577 U.S. _, 136 S. Ct. 718, 733 (2016) (affirming that *Miller* extended *Graham* to even homicide cases except in the rarest of cases where the sentence determines the particular child "exhibits such irretrievable depravity that rehabilitation is impossible").

[2] *Graham*, 560 U.S. at 68.

*Miller* holds that the "distinctive attributes of youth" are not "crime-specific," but apply even to adolescents who "commit terrible crimes," and identifies "three significant gaps between juveniles and adults:"

- Adolescents' "lack of maturity" and "underdeveloped sense of responsibility" engender "recklessness, impulsivity, and heedless risk-taking."
- Adolescents are more susceptible to negative environmental influences and pressures, "including from their family and peers," in part because adolescents "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings."
- Adolescents are more likely to change: "a child's character is not as well-formed as an adult's, his traits are less fixed and his actions are less likely to be evidence of irretrievable depravity."[3]

*Roper*, *Graham*, and *Miller* all relied heavily on then-available advances in neuroscience which documented the highly significant neurobiological differences between adolescent and adult brains. "Our decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well."[4] Current developments in neuroscience, many of which were not available when *Roper*, *Graham*, and *Miller* were decided, conclusively demonstrate that the same neurobiological "transient qualities of youth" last beyond the age of 17. The adolescent brain does not magically mature on its eighteenth birthday. This fact is significant because the adolescent brain is so different from the adult brain.

Research pioneered by Dr. Laurence Steinberg, Distinguished University Professor of Psychology, Temple University, demonstrates that the human brain

---

[3] Miller, 567 U.S. at 471.
[4] *Id.*

undergoes a "massive reorganization" during the teenage years.  These changes are both structural and functional and make adolescence a stage of life biologically distinct from childhood and adulthood.[5]  Although the brain's logical capabilities are generally fully formed at 16, the systems controlling more complex judgments—such as risk/reward evaluations, responses to environmental stressors, and impulse control—do not completely develop until the mid-twenties.[6]

As the adolescent brain matures, it undergoes a temporary developmental imbalance between two neurobiological systems: the limbic system, associated with emotions and reward-seeking, and the prefrontal regulatory system, which governs rational judgment and impulse control.[7]  During early and middle adolescence, the limbic system experiences a "rapid and dramatic increase in dopaminergic activity," causing a marked increase in reward seeking, sensation seeking, and accompanying

---

[5] Laurence Steinberg, *A Behavioral Scientist Looks at the Science of Adolescent Brain Development*, 72 Brain & Cognition 160, 160 (2010) [hereinafter Steinberg, *Behavioral Scientist*]; *see* Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 Ann. Rev. Clinical Psychol. 459, 465 (2009) [hereinafter Steinberg, *Adolescent Development*].

[6] *See, e.g.*, Nat'l Research Council, Comm. on Assessing Juvenile Justice Reform, *Reforming Juvenile Justice: A Developmental Approach* 132 (Richard J. Bonnie et al. eds., 2013); Elizabeth Cauffman & Laurence Steinberg, *(Im)maturity of Judgment in Adolescents: Why Adolescents May Be Less Culpable Than Adults*, 18 Behav. Sci. & L. 741, 744 (2000).

[7] *See, e.g.*, Nat'l Research Council, *supra* note 6, at 2; Steinberg, *Adolescent Development*, *supra* note 5, at 466-65; Alison Gopnik, *What's Wrong With the Teenage Mind*, Wall St. J., Jan. 28, 2012.

risky behavior.[8]  The reward centers of the adolescent brain are more active than those of adults, leading to an overestimation of rewards versus risks.[9]

At the same time, "compelling neurobiological evidence" demonstrates that the brain's regulatory system undergoes a more gradual, linear maturation over the course of adolescence.[10]  This means that adolescents have a qualitatively higher neurological inclination to engage in risky activity, while at the same time they have a qualitatively lower ability to control impulses or accurately assess future consequences.  "Adolescents develop an accelerator a long time before they can steer and brake."[11]  The ability to regulate and assess increases gradually as adolescents age.[12]

Studies further show that emotionally-charged situations exacerbate this discrepancy, leaving teenagers—especially young men—even less able to exercise the regulatory functions of the brain in the very contexts when those moderating functions are most needed. While young men may be good at "cold reasoning," their

---

[8] Steinberg, *Adolescent Development*, *supra* note 5, at 466; *see* Nat'l Research Council, *supra* note 6, at 97-98; Gopnik, *supra* note 7.

[9] *See, e.g.*, Gopnik, *supra* note 7; David Dobbs, *Beautiful Brains*, Nat'l Geographic Mag., Oct. 2011.

[10] Steinberg, *Adolescent Development*, *supra* note 5, at 466; *see, e.g.*, Nat'l Research Council, *supra* note 6, at 92, 96-99; Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Dev. Rev. 78, 83 (2008) [hereinafter Steinberg, *Risk-Taking*].

[11] Gopnik, *supra* note 7.

[12] *See, e.g.*, Laurence Steinberg, *A Dual Systems Model of Adolescent Risk-Taking*, 52 Developmental Psychobiology 216 (2010); Charles Geier & Beatriz Luna, *The Maturation of Incentive Processing and Cognitive Control*, 93 Pharmacology, Biochemistry, & Behav. 212, 215-18 (2009).

ability to reason at times of stress and excitement—"hot reasoning"—remains undeveloped and immature.[13]

Ultimately, this developmental imbalance explains why "adolescence is a time of inherently immature judgment."[14] Although teenagers might seem as intelligent as adults, "their ability to regulate their behavior in accord with these advanced intellectual abilities is more limited."[15]  Adolescents overvalue immediate rewards and are less future-oriented compared to adults; they are more impulsive, more susceptible to emotion and stress, and less likely to perceive the consequences of their actions, especially negative ones.[16]  In summary, adolescents and people in their early 20s are:

---

[13] *See, e.g.*, Nat'l Research Council, *supra* note 6, at 92-93; Bernard Figner et al., *Affective and Deliberative Processes in Risky Choice*, 35 J. Experimental Psychol. 709, 709 (2009).  Anatomically, these changes can be explained as follows. The brain experiences a loss of "gray matter"—the shedding of excess, unused synaptic connections—and a gradual increase in "white-matter," a coating of myelin which speeds neural-transmission. *See, e.g.*, M.R. Asato et al., *White Matter Development in Adolescence: A DTI Study*, 20 Cerebral Cortex 2122 (2010); Dobbs, *supra* note 9; Geier & Luna, *supra* note 12, at 215-16 ; Steinberg, *Adolescent Development*, *supra* note 5, at 466. Together, the reduction in gray matter and the increase in white matter improves the efficiency and connectivity of neural signaling in the prefrontal cortex and among multiple regions of the brain. *See, e.g.*, Nat'l Research Council, *supra* note 6, at 99; Geier & Luna, *supra* note 12, at 215-16; Steinberg, *Risk-Taking*, *supra* note 10, at 93-95. These functional changes are associated with improved "response inhibition, planning ahead, weighing risks and rewards, and the simultaneous consideration of multiple sources of information." Steinberg, *Risk-Taking*, *supra* note 10, at 94; *see, e.g.*, Nat'l Research Council, *supra* note 6, at 99; Asato et al., *supra*, at 2123; Geier & Luna, *supra* note 12, at 215
[14] Steinberg, *Adolescent Development*, *supra* note 5, at 467.
[15] *Id.*
[16] *Id.* at 468-70; Human Rights Watch & Amnesty Int'l, *The Rest of Their Lives: Life Without Parole for Child Offenders in the United States* 46 (2005).

- More likely than adults to underestimate the number, seriousness, and likelihood of risks involved in a given situation;
- Prone to engage in what psychologists call "sensation-seeking"—the pursuit of arousing, rewarding, exciting or novel experiences;
- Less able to control their impulses and consider the future consequences of their actions and decisions;
- More socially and emotionally immature than their intellectual maturity would suggest.

Courts have begun extending the Eighth Amendment protections of *Roper*, *Graham*, *Miller*, and *Montgomery* to young adults. For example, a trial court in Kentucky declared the death penalty unconstitutional for offenders under 21.[17]  The court reasoned that "given the national trend toward restricting the use of the death penalty for young offenders, and given the recent studies by the scientific community, the death penalty would be an unconstitutionally disproportionate punishment for crimes committed by individuals under twenty-one (21) years of age [at the time of the offense]."[18]  A New Jersey appellate court similarly relied on *Miller* to support its decision to remand for resentencing a 75-year aggregate sentence imposed for murder committed by a 21-year-old defendant, reasoning that where the sentence is the practical equivalent of life without parole, courts must

---

[17] *See Commonwealth v. Bredhold*, No. 14-CR-161, Order Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette [Ky.] Cir. Ct. Aug. 1, 2017) (Scorsone, J.).

[18] *Id.* (relying heavily on brain science-related testimony to conclude that the death penalty is a disproportionate punishment for offenders younger than 21 because such individuals are categorically less culpable and have a better chance at rehabilitation); *see also Commonwealth v. Diaz*, No. 15-CR-584-001, Order Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette [Ky.] Cir. Ct. Sept. 6, 2017) (Scorsone, J.).

"consider at sentencing a youthful offender's failure to appreciate risks and consequences as well as other factors often peculiar to young offenders."[19]

The American Bar Association has relied upon this change in neuroscience as the reason for its Resolution 111, which "urges each jurisdiction that imposes capital punishment to prohibit the imposition of a death sentence on or execution of any individual who was 21 years or younger at the time of the offense."[20] The resolution explains its rationale as based on "findings [that] demonstrate that 18 to 21 year olds have a diminished capacity to understand the consequences of their actions and control their behavior in ways similar to youth under 18."[21] "Additionally, research suggests that late adolescents, like juveniles, are more prone to risk-taking and that they act more impulsively than older adults in ways that likely influence their criminal conduct."[22]  Nor are "18 to 21 year olds…fully

---

[19] *State v. Norris*, No. A-3008-15T4, 2017 WL 2062145, at *5 (N.J. Super. Ct. App. Div. May 15, 2017); s*ee also Cruz v. United States*, No. 11-CV-787 (JCH), 2017 WL 3638176 (D. Conn. April 3, 2017) (granting defendant's motion for a hearing on a § 2255 motion, concluding that he raised an issue of material fact as to whether a youth of 18 years and 20 weeks is legally and developmentally a child such that his mandatory life-without-parole sentence violates the Eighth Amendment).
[20] American Bar Association Resolution 111, available at https://www.americanbar.org/content/dam/aba/images/abanews/mym2018res/111.pdf [hereinafter ABA Resolution].
[21] *Id.* (citing Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339, 343 (1992); Kathryn L. Modecki, *Addressing Gaps in the Maturity of Judgment Literature: Age Differences and Delinquency*, 32 L. & Hum. Behav. 78, 79 (2008) ("In general, the age curve shows crime rates escalating rapidly between ages 14 and 15, topping out between ages 16 and 20, and promptly deescalating.")).
[22] *Id.* (citing Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 644 (2016)).

mature enough to anticipate future consequences."[23]   Furthermore, "profound
neurodevelopmental growth continues even into a person's mid to late twenties."[24]
The resolution cited to a study sponsored by the National Institute of Mental Health
which tracked the brain development of 5,000 children and discovered their brains
were not fully mature until at least 25 years of age.[25]

 The national consensus now recognizes that youth does not end at 18.  The
United States Sentencing Commission, for example, issued a report in 2017,
*Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015* ("The Youthful
Offenders Report") that affirms this view.  The Commission, based on "recent case
law and neuroscience research," redefined "youthful offender" to include offenders
"25 years old and younger:"

> Traditionally, youthful offenders often have been defined as those under the
> age of 18, but for purposes of this study, the Commission has defined youthful
> offenders as a federal offender 25 years old or younger at the time of
> sentencing. The inclusion of young adults in the definition of youthful
> offenders is informed by recent case law and neuroscience research in which
> there is a growing recognition that people may not gain full reasoning skills
> and abilities until they reach age 25 on average.[26]

 Multiple federal statutes now recognize that 20 year olds lack the full
maturity of adulthood.  The Foster Care Act of 2008, permits states to define "child"

---

[23] *Id.* (citing Laurence Steinberg et al., *Age Differences in Future Orientation and
Delay Discounting*, 80 Child Dev. 28, 35 (2009)).
[24] *Id.* (citing Christian Beaulieu & Catherine Lebel, *Longitudinal Development of
Human Brain Wiring Continues from Childhood into Adulthood*, 27 J. Neuroscience
31 (2011); A. Pfefferbaum et al., *Variation in Longitudinal Trajectories of Regional
Brain Volumes of Healthy Men and Women (Ages 10 to 85 Years) Measured with
Atlas-Based Parcellation of MRI*, 65 NeuroImage 176 (2013)).
[25] *Id.* (citing N. Dosenbach et al., *Prediction of Individual Brain Maturity Using
fMRI*, 329 Science 1358 (2011)).
[26] *The Youthful Offenders Report,* at *5.

as "an individual . . . who has not attained 19, 20 or 21 years of age." The Gun Control Act of 1968 prohibits individuals under age 21 from purchasing handguns. 18 U.S.C. §§ 922(b)(1), (c)(1). The National Minimum Drinking Age Act of 1984 prohibits those under 21 from purchasing alcohol. 23 U.S.C. § 158.

State legislatures have responded to the advances in neuroscience by affording greater protections to youthful offenders who have passed their 18th birthday. "[A]s of 2016, all fifty states and the District of Columbia recognized extended age jurisdiction for juvenile courts beyond the age of 18, in comparison to only 35 states in 2003." *Cruz*, 2017 WL 3638176, at *56. "Between 2016 and 2018, 5 states and 285 localities raised the age to buy cigarettes from 18 to 21." *Id.* The majority of states now set 21 as the line at which children age out of foster care.[27]

---

[27] Alabama, Ala. Code § 38-7-2(1); Alaska, Alaska Stat, § 47.10.080(c); Arizona, Ariz. Rev.Stat. Ann. § 8-501(B); California, Cal. Welf. & Inst. Code § 303(a); Colorado, Colo. Rev.Stat. § 19-3-205(2)(a); Connecticut, Conn. Gen. Stat. Ann. § 17a-93(a); Delaware, Del. Code Ann. tit. 10, § 929(a); Washington, D.C., D.C. Code Ann. § 16-2303; Florida, Fla. Stat. Ann. § 39.013(2); Georgia, Ga. Code Ann. § 15-11-2(10)(c); Idaho, Idaho Code Ann. §§39-1202(3) & (9); Illinois, Ill. Comp. Stat. Ann. § 405/2-31(1); Indiana, Ind. Code Ann. §31-28-5.8-5(a); Kansas, Kan. Stat. Ann. § 38-2203(c); Kentucky, Ky. Rev. Stat. § 620.140(1)(d)-(e); Maryland, Md. Code Ann., Cts. & Jud. Proc. § 3-804(b); Michigan, Mich. Comp. Laws Ann. § 772.981-85; Minnesota, Minn. Stat. Ann. § 260C.451; Mo. Ann. Stat. §110.04 (12); Nebraska, Neb. Rev. Stat. Ann. §§ 43-905 & 43-4502; Nevada, Nev. Rev. Stat. Ann. § 432B.594; New Hampshire, N.H. Rev. Stat. Ann. § 169-C:4; New Jersey, N.J. Stat. Ann. § 30:4C-2.3; New York, N.Y. Fam. Ct. Act § 1087(a); Ohio, Ohio Rev. Code Ann. §2151.81; Oregon, Or. Rev. Stat. Ann. § 419B.328; Pennsylvania, 42 Pa. Const. Stat. Ann. §6302; South Dakota, S.D. Codified Laws § 26-6-6.1; Tennessee, Tenn. Code Ann. §§37-1-102(4)(G) & 37-2-417(b); Texas, Tex. Fam. Code Ann. § 263.602; Virginia, Va. Code Ann. § 63.2-905.1; Washington, Wash. Rev. Code Ann. § 74.13.031(16); West Virginia, W. Va. Code Ann. § 49-2B-2(x); and Wyoming, Wyo. Stat. Ann. § 14-3-431(b).

Other states that do not establish the line at 21, nevertheless set it above 18.[28]
Vermont sets it at age 22.[29]

There are a plethora of nationwide initiatives designed to protect late adolescents who have passed their 18th birthday. "Young Adult Courts" have been created in San Francisco, CA (begun 2015 for age 18-25); Omaha, NE (up to age 25); Kalamazoo County, MI (begun in 2013 for age 17-20); Lockport City, NY; and New York, NY (begun 2016 for age 18-20). The *Youthful Offender Report* details probation/parole programs, programs led by prosecutors, community-based programs, hybrid programs, and prison programs all reflecting the national, nonpartisan recognition that late adolescents should not be subject to the full brunt of adult criminal penalties. *Id.* at *25-29, 30-40.

Finally, the ABA Resolution mentioned above cites additional evidence that community standards have evolved, including some of the examples presented above.[30]  In addition, the resolution notes that many rental car companies set minimum rental ages at 20 or 21, with higher rental fees for individuals under age 25.[31]  Under the Free Application for Federal Student Aid (FAFSA), the Federal

---

[28] Maine, (age twenty), Maine Rev. Stat. tit. 22, §§ 4037-A(1) & (5); New Mexico, (age nineteen), N.M. Stat. Ann. § 32A-4-25.3; Wisconsin, (age nineteen), Wis. Stat. Ann. §48.355(4).

[29] Vt. Stat. Ann. tit. 33, § 4904 (age twenty-two).

[30] ABA Resolution, *supra* note 20, at 7-9.

[31]*Id.* (citing *What are Your Age Requirements for Renting in the US and Canada*, Enterprise.com, https://www.enterprise.com/en/help/faqs/car-rental-under-25.html (last visited July 8, 2019); *Restrictions and Surcharges for Renters Under 25 Years of Age*, Budget.com, https://www.budget.com/budgetWeb/html/en/common/agePopUp.html (last visited July 8, 2019); *Under 25 Car Rental*, Hertz.com,

Government considered individuals under the age of 23 legal dependents of their parents.[32]  Relatedly, the Internal Revenue Service allows students under 24 to be dependents for tax purposes and the Affordable Care Act allowed individuals under 26 to remain on their parents' health insurance.[33]

II.    <u>A below-guideline sentence is consistent with Mr. Keyes' role in the offense and his nature and characteristics.</u>

Mr. Keyes seeks a sentence within his drug weight guideline range that would apply today.  Given the above information about the developing brain of adolescents, and given that Mr. Keyes was 18 at the time of the offense, this Court should consider Mr. Keyes' age a mitigating factor that militates in favor of a low-end sentence.

Furthermore, while the Fourth Circuit upheld the murder guideline cross-reference in his case, this Court should consider that Mr. Keyes did not commit the murder himself and that three of the other co-defendants, who were part of the same conspiracy and therefore responsible for the same murder under the theory of conspiracy liability, have all been released:

- Marlon Dale Daniel, released on September 13, 2012 (age 56)
- Alonzo William Trice, released on February 12, 2016 (age 61)
- James Allen Cain, III, released on October 30, 2015 (age 50)

---

https://www.hertz.com/rentacar/misc/index.jsp?targetPage=Hertz_Renting_to_Drivers_Under_25.jsp (last visited July 8, 2019)).

[32] *Id.* (citing *Dependency Status*, Federal Student Aid, https://studentaid.ed.gov/sa/fafsa/fillingout/dependency (last visited Sept. 21, 2017). 59 (last visited July 8, 2019)).

[33] *Id.* (citing 26 U.S.C. § 152 (2008); 42 U.S.C. § 300gg-14 (2017); *Dependents and Exemptions 7*, I.R.S, https://www.irs.gov/faqs/filing-requirements-statusdependents-exemptions/dependents-exemptions/dependents-exemptions-7 (last visited July 8, 2019)).

The only other defendant who remains incarcerated is Gregory Felton, who also went to trial.  Unlike Mr. Keyes, however, the jury found Mr. Felton guilty of personally using a firearm to commit the murder that enhanced Mr. Keyes guideline range.

It is appropriate for Mr. Keyes to serve a longer sentence than his co-defendants who pled guilty, but a sentence to the low-end of his guideline range would more than account for his decision to go to trial.  Mr. Keyes' decision to go to trial was one he made at the age of 18, and without any real experience in the criminal justice system.  Prior to this offense, Mr. Keyes had a juvenile offense for damaging private property (at age 16) and juvenile probation violations for using marijuana.  To no surprise, the co-defendants who were older, and with experience in the criminal justice system, did not make the reckless decision to go to trial.  Mr. Keyes was 15 years younger than Mr. Cain, 21 years younger than Mr. Daniel, and 26 years younger than Mr. Trice. Only Mr. Felton and Mr. Keyes, recruited to the conspiracy as children, remain incarcerated.

It would be appropriate to sentence Mr. Keyes to a sentence within the drug weight guideline range that would apply today for his drug weight of 1.5 kg of cocaine base.  A base offense level of 32, with no points for acceptance of responsibility, would result in a guideline range of 135-168 months.  While Mr. Keyes received an enhancement for obstructing justice at the time of his original sentencing, those points were added because he said he was innocent during a time when he was appealing his sentence.  The low-end of this guideline range, or 135

19

months, plus the 120 consecutive months for his gun offense, would lead to a sentence of 255 months or 21.25 years.

The most recent United States Sentencing Commission 2018 Annual Report about sentencing confirms that only 36% of sentences for drug offenses are within the guideline range.[34]  The rest are lower than the guideline range.  Even for sentences under the guideline range for murder, § 2A1.1, district courts sentence defendants below the guideline range 60% of the time.  A sentence of 255 months is sufficient but not greater than necessary for Mr. Keyes.

Respectfully submitted,

Tadashi Keyes

By Counsel

/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market St, Ste 106
Charlottesville, VA 22902
Tel (434) 220-3380

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (ECF) to all parties of record

/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)

---

[34] https://www.ussc.gov/research/sourcebook-2018 (last accessed July 8, 2019)

Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market St, Ste 106
Charlottesville, VA 22902
Tel (434) 220-3380